**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
WESTERN DIVISION**

Shawn L. McFerren,                     :          Case No. 3:11-CV-1677

      Plaintiff,                       :

v.                                     :

Commissioner of Social Security,       :          **MAGISTRATE'S REPORT AND
                                                  RECOMMENDATION**

      Defendant.                       :

## I. INTRODUCTION

Plaintiff seeks judicial review of the Defendant's final determination denying his claim for an award of Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act (the Act), which appears in Title 42 of the UNITED STATES CODE at Section 1381 *et seq*.  Pending are the parties' briefs on the merits and Plaintiff's Reply (Docket Nos. 15, 16 & 19).  For the reasons that follow, the Magistrate recommends that the Court reverse the Commissioner's decision and remand the case to the Commissioner for consideration consistent with this report.

## II. PROCEDURAL BACKGROUND

This case was commenced when Plaintiff filed an application for SSI on June 19, 2008, alleging that he became disabled on February 1, 2000 (Docket No. 11, pp. 112-114 of 482).  The application was

denied initially and upon reconsideration (Docket No. 11, pp. 71-73, 76-78 of 482).  On June 4, 2010, Plaintiff, represented by counsel, and Vocational Expert (VE) James Sorno, appeared and testified at an administrative hearing before Administrative Law Judge (ALJ) J. Alan Mackay (Docket No. 11, pp. 13-14 of 482).  The ALJ rendered an unfavorable decision on June 25, 2010 (Docket No. 11, pp. 56-58 of 482).  The Appeals Council denied Plaintiff's request for review on June 10, 2011 (Docket No. 11, pp. 4-7 of 482).  Plaintiff filed a timely action seeking judicial review of the Commissioner's final decision.

### III.  FACTUAL BACKGROUND.

Plaintiff, a Toledo, Ohio resident, testified at the hearing that he was 26 years of age, weighed between 180 and 183 pounds and stood 6'2" tall.  Plaintiff's grandmother provided his residential and financial support.  Plaintiff had one child who resided with the child's mother.  Occasionally Plaintiff visited his child (Docket No. 11, pp. 20-22 of 482).

Describing himself as "slow" in his ability to comprehend, Plaintiff had been placed in special education classes.  He completed the eighth grade but Plaintiff could not read for knowledge or write coherently (Docket No. 11, pp. 22-23, 30 of 482).  Plaintiff never held a driver's license (Docket No. 11, p. 37 of 482).

Plaintiff had no substantial gainful work activity that he had done within the past fifteen years as he never worked long enough to learn how to perform the job.  He explained that he was typically discharged from employment because he could not follow directions (Docket No. 11, pp. 23-24, 43 of 582).

Plaintiff had physical maladies which included nephralgia (pain in the kidney), uncontrolled hypertension and migraines/headaches.  Plaintiff had mental health maladies which included a diagnosis and treatment for depression.

The enlargement of Plaintiff's kidney, intense pain and urinary urgency were all symptomatic

2

of kidney disease (Docket No. 11, pp. 24-26 of 482; medical-dictionary.thefreedictionary.com/nephralgia).

Diagnosed at age 15, Plaintiff had uncontrolled hypertension for which he underwent intensive treatment.  He was prescribed three medications to assist in regulating this condition (Docket No. 11, pp. 29-30 of 482).

Plaintiff experienced migraine headaches a couple of times daily.  Each occurrence lasted for a few minutes.  Plaintiff noticed that the onset occurred when he was "doing too much," standing too quickly or being exposed to extreme heat.  Plaintiff treated the symptoms with sleep and over-the-counter medications such as aspirin or Tylenol® (Docket No. 11, pp. 32-33 of 482).

Plaintiff was being treated by personnel at Unison Behavioral Health Group, a behavioral health and substance abuse treatment provider, for symptoms of depression (Docket No. 11, p. 30 of 482; www.unisonbhg.org/).  Although he never acted upon them, Plaintiff had thoughts of suicide (Docket No. 11, p. 42 of 482).

Plaintiff had also been treated at Rescue Mental Health, a mental healthcare facility committed to providing services for those experiencing emotional or psychiatric crisis.  During crisis stabilization, Plaintiff addressed emotional stressors arising from his mother's shooting and post-incarceration implications (Docket No. 11, pp. 30-31 of 482; www.rescuemhs.com/).

Plaintiff explained that he was paranoid after having been bullied a lot when he was younger.  He also described having difficulty managing his emotions (Docket No. 11, pp. 33-34 of 482).

Plaintiff estimated that:  (1) he could lift a gallon of milk (approximately 8.4 pounds) from the floor over his head for twenty minutes; (2) his ability to lift was affected by breathlessness, cephalgia and fatigue; (3) he could stand for seven to ten minutes before he became lightheaded and (4) he could sit without difficulty although getting up created a problem (Docket No. 11, pp. 34-35, 37, 43 of 482;

3

wiki.answers.com/).  Pushing and pulling with his arms caused head pain likely caused by an elevated blood pressure.  Plaintiff had a little pain when bending and he had no difficulty with using pedals to push or pull (Docket No. 11, pp. 35-36 of 482).  Plaintiff's ability to focus and take initiative was impaired (Docket No. 11, p. 42 of 482).

Plaintiff claimed that he could make his bed, wash and dress himself.  Plaintiff changed his clothes daily and sometimes every three days.  He could not cook because he was prone to burning what he cooked and he could not read the recipes.  He had no difficulty washing a minimal number of dishes. He had some difficulty washing several dishes if he had to stand an inordinate amount of time.  Plaintiff was able to set the washing machine by rote but he was unable to bring the laundry from the basement. Plaintiff could take the bus provided he had assistance with identifying the appropriate bus (Docket No. 11, pp. 38-39, 43 of 582).

Plaintiff did not obtain the optimal amount of sleep.  He reported that he sleep in hourly increments.  Plaintiff claimed that he had one friend who visited him; he was not a member of any clubs; he did not attend movies,  and he did not date.  Plaintiff was a model car enthusiast; however, he had not assembled a car since 1996 (Docket No. 11, pp. 40-41).

The VE testified in response to four hypothetical questions.  The <u>first</u> hypothetical posed by the ALJ included the following characteristics of the hypothetical plaintiff:

(1)   Age range of 24 to 26 years;
(2)   Less than an eighth grade education;
(3)   Exertional impairment that limited the hypothetical plaintiff to the medium exertional level; and
(4)   A frequent inability to understand, remember or carry out complex or detailed instructions.

It was the VE's opinion that given these characteristics, the following jobs would be available to the hypothetical plaintiff:

| Job | DOT[1] | Exertional Levels | SVP Levels[2] | National/Ohio Economies |
|---|---|---|---|---|
| Vehicle Cleaner | 919.687-014 | Medium | 1 | 330,000/12,060 |
| Hand Packager | 920.587-018 | Medium | 2 | 777,630/50,708 |
| Bakery Worker | 524.687-022 | Light | 2 | 180,160/17,610 |

(Docket No. 11, pp. 45-46 of 482).

If Plaintiff's psychological and physical limitations were considered credible, specifically, the problems with sitting/standing, the problems with anger, having to rest two hours every other hour and having to rest every other day for two hours, there would be no jobs that the hypothetical plaintiff could perform. Such limitations would interfere with a full time competitive job performance (Docket No. 11, p. 46 of 482).

The <u>second</u> hypothetical question posed by counsel included the following criterion:

---

[1]

The Dictionary of Occupational Titles (DOT) was developed in response to the demand of an expanding public employment service for standardized occupational information to support job placement activities. Highly trained occupational analysts collect reliable data which was provided to job interviewers so they could systematically compare and match the specifications of employer job openings with the qualifications of applicants who were seeking jobs through its facilities. There are four editions and two supplements that have charted changes in occupational definitions and content with the intent of providing the best snapshot of how jobs continue to be performed in the majority of industries across the county.

[2]

Specific Vocational Preparation is a component of Worker Characteristics information found in the DOT (U.S. Department of Labor, 1991). SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. This training may be acquired in a school, work, military, institutional, or vocational environment. It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job. The levels of time include: (1) Short demonstration only; (2) Anything beyond short demonstration up to and including 1 month; (3) Over 1 month up to and including 3 months; (4) Over 3 months up to and including 6 months; (5) Over 6 months up to and including 1 year; (6) Over 1 year up to and including 2 years; (7) Over 2 years up to and including 4 years; (8) Over 4 years up to and including 10 years; and (9) Over 10 years.  Www.onetonlne/org/help/nline/svp.

5

(1)    Age range of 24 to 26 years of age;

(2)    Borderline intellectual functioning such that the person is considered functionally illiterate, reading at a 2.5 level, spelling at a 2.5 level and performing math at t 4.5 level;

(3)    Limited in reasoning at a level of one;

(4)    Language levels are markedly impaired;

(5)    No contact with the general public because of social phobias;

(6)    Superficial contact with employees, employers and supervisors;

(7)    Moderate limitations with regard to the ability to maintain attention and concentration for extended periods of time;

(8)    Inconsistent persistence;

(9)    Difficulty completing tasks assigned;

(10)    Insight into overall level of judgment one third of a day;

(11)    Requires supervision handling financial issues;

(12)    Has reduced efficiency in jobs that require production pace and tasks;

(13)    Needs to be able to set own time frames for being able to complete work;

(14)    Has difficulty standing more than ten minutes and can sit for at least six hours out of an eight-hour day;

(15)    Has the ability to lift and carry five pounds occasionally and five pounds frequently;

(16)    Cannot engage in repetitive pushing/pulling arm controls and levers; and

(17)    Moderate limitations in bending or repetitive foot movements.

The VE opined that this hypothetical plaintiff would not be able to perform any work numerated as alternate work.  The inability to follow through and complete tasks during the day alone would preclude full time work (Docket No. 11, pp. 46-48 of 582).

In the _third_ hypothetical question, counsel asked the VE to "change the hypothetical slightly and in terms of mental limitations–the physical part is the same, but assume for a moment that we do have a client that is borderline in flexible functioning, the reading level is as I've indicated and so forth, . . . .the inability to understand and carry out detailed instructions is not significant, but maintain attention and concentration, perform activities–." The VE responded that since the hypothetical person was being paid to work full time, it would be problematic if the employee were unable to perform the work as expected.

6

The VE affirmed counsel's observation that in general, an employer would not tolerate:  (1) the taking of breaks that were not ordinarily scheduled to the extent that the employee would be unable to complete a normal work week without interruptions or (2) the imposition of psychologically based symptoms such that the hypothetical plaintiff would need to lie down for a couple of hours during the workday.

The VE added that absenteeism one day a month or twelve days a year was an unacceptable attempt at extending the appropriate limits of performance (Docket No. 11, pp. 49-50).

### IV.  PLAINITFF'S EDUCATIONAL HISTORY.

The educational history from Plaintiff's school records showed that beginning in first grade, Plaintiff received a failing progress report in reading and English.  Plaintiff was retained in the first grade where he performed satisfactorily in reading and English.  In grades two and three, Plaintiff performed poorly in reading and language arts.  Identified as having a specific learning disability in the spring quarter of his third grade year, Plaintiff maintained an average grade of "D" in his learning disability classes.  In his fifth grade year, Plaintiff's grades fluxuated between a "D" and "C-."  Plaintiff's progress during grade seven was significantly poor even though he was in learning disability classes (Docket No. 11, p. 210 of 482).

The Metropolitan Achievement Test[3] (MAT) administered in the second grade placed Plaintiff in the below average categories in vocabulary, reading comprehension, math computation and math problem solving.  Plaintiff's scores were between below average and average in the areas of word

---

[3]

The MAT is a standardized test for students in kindergarten through twelfth grade that covers language arts, math, science, social studies, spelling and reading.  The test evaluates skills such as critical thinking and foundation skills.  The aim of the exam is to help educators and parents evaluate a student's ability and predict future success.  Www.tests.com/Metropolitan-Achievement-Test

recognition, math concepts, spelling and language (Docket No. 11, p. 247 of 482).

During Plaintiff's third grade year, he attained MAT scores that placed him in the 2.4 grade level in computations, 1.6 grade level in problem solving, 1.8 grade level in concepts, 1.9 grade level in spelling and 1.6 grade level in language (Docket No. 11, p. 217 of 482).

In his third grade year, Plaintiff's MAT scores were below average in math concepts, math computation, math problem solving, spelling and language (Docket No. 11, p. 248 of 482).

During the second grading period of his fifth grade year in 1995/1996, Plaintiff attained a "C" in reading, language, mathematics, social studies and spelling (Docket No. 11, pp. 237-238 of 482). By the third grading period, Plaintiff's reading and spelling grades had fallen to a "D" (Docket No. 11, p. 239 of 482). Plaintiff's reading and mathematics grades spiraled to an "F" in the final quarter but his language grade was a "D" (Docket No. 11, p. 240 of 482).

Later during his fifth grade school year, Plaintiff was granted an emergency admission to Charter Behavioral Health System of Toledo, a mental health treatment provider. He was discharged with a referral to seek follow-up care at Harbor Behavioral Health System, also a mental health treatment provider (Docket No. 11, pp. 231-235 of 482; www.harbor.org).

Also in his fifth grade school year, Plaintiff was disciplined several times for unruly behaviors. As a consequence of some of his behaviors, Plaintiff was reprimanded and ultimately suspended for five days (Docket No. 11, pp. 250-251; 256; and 258 of 482).

The Kaufman Test of Educational Achievement (KTEA)[4] was administered in Plaintiff's fifth

---

[4]

The KTEA test was designed to measure school achievement of children in grades 1 through 12 in the areas of comprehension, reading, mathematics and spelling. Www.kids-iq-tests.com/Kaufman-Test-Educational-Achievement.html

grade year.  The results showed that Plaintiff had a comprehension of math at a 3.8 grade level; reading comprehension at the 2.4 grade level and spelling ability at the first grade level (Docket No. 11, p. 245 of 482).

In the first quarter of his sixth grade year, Plaintiff earned a grade of "F" in reading and a grade of "C" in language, mathematics, social studies, science health, handwriting and spelling.  He earned an "A" in physical education and music (Docket No. 11, p. 241 of 482).  During the second quarter of his sixth grade year, Plaintiff attained a grade of "B" in reading and his mathematics score was a "D" (Docket No. 11, p. 242 of 482).

The results from the KTEA test administered in Plaintiff's sixth grade year showed abilities in math at the 4.2 grade level, reading at the 2.5 grade level and spelling at the second grade level (Docket No. 11, p. 246 of 482).  In February 1997, Plaintiff served an after-school detention (Docket No. 11, pp. 262, 266 of 482).  In March 1997, Plaintiff was disciplined for disorderly conduct (Docket No. 11, p. 259 of 482).

During school year 1999/2000, Plaintiff's scholastic record shows that he earned an "F" in the majority of his classes (Docket No. 11, p. 181 of 482).  His scaled scores on the Ohio Ninth Grade Proficiency Test showed that he failed in the areas of writing, reading, math, citizenship and science.

Plaintiff entered the Job Corp, a free education and training program that helps young people learn a career, on September 1, 1999 and withdrew from the program on January 24, 2000 (Docket No. 11, p. 182 of 482; www.jobcorps.gov/).

### V. PSYCHOLOGICAL EVALUATIONS AND TREATMENT

On May 12, 1994, Dr. James Seaman, a school psychologist, administered the Weschler

Intelligence Scale for Children, Third Edition (WISC-III), an intelligence test designed for children between the ages of six and sixteen inclusive.  Plaintiff was eleven years of age.  The results of the test showed a full scale IQ of 90.  A raw score of 90 placed Plaintiff in the average range of intellectual performance (Docket No. 1, p. 212 of 282; www.iupui.edu/~flip/wechsler.html).

From November 25, 2000 through January 25, 2000, Plaintiff underwent outpatient mental health services at Rescue Mental Health Services, Northwest Ohio's primary resource for emergency mental health care (Docket No. 11, p. 409 of 482; www.rescuemhs.com).

Dr. David V. House, Ph. D., a psychologist, conducted a clinical interview on June 25, 2002.  In addition to the interview, Dr. House administered three tests:  (1) Wechsler Adult Intelligence Scale-III (WAIS-III), (2) Wechsler Memory Scale, Form III (WMS-III) and (3) the Wide Range Achievement Test (WRAT), reading subtest.  The WAIS-III measures intelligence in adults and adolescents.  WMS-III, is a fast, reliable survey of auditory and visual memory abilities.  WRAT is an achievement test which measures an individual's ability to read words, comprehend sentences, spell and compute solutions to math problems (Docket No. 11, p. 275 of 482; www.concordspedpac.org/WAIS_III.html; http://cps.nova.edu/~cpphelp/WMS-3.html; cps.nova.edu/~cpphelp/WRAT.html).

Dr. House considered that Plaintiff's performance on the WAIS-III was affected by the onset of a headache so his full scale intelligence quotient was 67.  This score falls within the mildly mentally retarded range of adult intellectual functioning.  The examiner noted that Plaintiff had difficulty with verbal concept formation, verbal social judgment and common sense (Docket No. 11, p. 280 of 482).

With respect to the results from the WMS-III examination, Plaintiff's distraction–the headache–was indicative that a valid outcome could not be reached.  Dr. House estimated that Plaintiff's memory functioning was consistent with his intellectual functioning described on the WAIS-III (Docket

10

No. 11, p. 281 of 482).

On the WRAT examination, Plaintiff obtained a raw score of 28, a standard score of 63, a percentile ranking of one and a grade score of two.  Dr. House concluded that Plaintiff "presents as illiterate" (Docket No. 11, p. 281 of 482).

Dr. House also concluded, with reasonable scientific certainty, that Plaintiff would suffer from a mood disorder, not otherwise specified, a conduct disorder, cannabis abuse in remission, a reading disorder, a learning disorder and borderline intellectual functioning.  Plaintiff had no limitation in his ability to understand and follow directions.  He had mild limitations in his level of adaptability as well as his ability to concentrate.  Plaintiff had moderate limitations in the ability to withstand stress and pressure; relate to others and deal with the general public; and have insight into his current situation and overall level of judgment (Docket No. 11, p. 282 of 482).  Dr. House assigned a global assessment of functioning score of 51 at the time of the clinical interview.  A score of 51 denotes the presence of moderate symptoms or moderate difficulty in social, occupational or school functioning[5] (Docket No. 11, p. 283 of 482).

On July 22, 2008, Dr. Christopher Layne, Ph. D., a psychologist, evaluated Plaintiff, focusing on Plaintiff's mental status and psychometric test results.  "Ms. Shelley Mitchell, a registered supervisee", administered the WAIS-III.  Plaintiff's full scale IQ score was 48, placing him in the moderately retarded range.  However, Dr. Layne noted that Plaintiff gave ridiculous answers to the test

---

[5]

The Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living.  The scale is presented and described in the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV), published by the American Psychiatric Association (4th ed. 2000).

questions, pretended that he did not know how old he was and pretended that he could not copy simple figures.

Using the DSM-IV, Dr. Layne made the following assessments in the following five dimensions:

(1)     Axis I:        **Clinical Disorders**:
                       Plaintiff is a malingerer
(2)     Axis II:       **Developmental Disorders and Personality Disorders**:
                       Borderline intellectual functioning and antisocial traits.
(3)     Axis III:      **Physical Conditions**:
                       Plaintiff has not endured physical ills that damage his mental health.
(4)     Axis IV:       **Severity of Psychosocial Stressors**:
                       Plaintiff has an arrest record.
**(5)     Axis V:        Highest Level of Functioning**:
                       During the past week, Plaintiff's symptom severity has been very mild.
                       His functional severity has also been very mild.

Dr. Layne was convinced that Plaintiff probably exaggerated his symptoms.  However, he concluded that (1) Plaintiff had a very mild impairment in his ability to understand and follow instructions; and (2) Plaintiff was not impaired in his ability to maintain attention to perform simple, repetitive tasks, relate to others, withstand day-to-day work stress and manage money (Docket No. 11, pp. 299-300 of 482).

Dr. Melanie Bergsten, Ph. D., a clinical psychologist, completed the Psychiatric Review Technique form and dated it on August 13, 2008.  It was her opinion that although Plaintiff's allegations were not credible, he had a medically determinable impairment that did not satisfy the diagnostic criteria, namely, borderline intellectual functioning.  There was insufficient evidence to evaluate Plaintiff's level of functioning (Docket No. 11, pp. 307, 315 of 482).

Ms. Mary E. Kastner, MSW, LISW-S, conducted a diagnostic assessment on March 13, 2009.

Her primary diagnosis was a Bipolar II Disorder.[6]  Ms. Kastner noted the presence of social phobias, post-traumatic stress disorder (PTSD) and cannabis dependence.  She entered a recommended treatment plan that would focus on improving Plaintiff's mood and energy level, reducing his anxiety and panic attacks, improving his life management skills and addressing PTSD issues (Docket No. 11, pp. 414-415 of 482).

Dr. Nestor P. Zambrano, M. D., a family practitioner and emergency medicine specialist, performed a mental functional capacity assessment based on his treatment of Plaintiff's physical impairments.  He suggested that Plaintiff had the following moderate limitations in the ability to:

(1)     Remember locations and work-like procedures;
(2)     Understand and remember detailed instructions;
(3)     Carry out detailed instructions;
(4)     Maintain attendance and concentration for extended periods;
(5)     Perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;
(6)     Sustain an ordinary routine without special supervision;
(7)     Work in coordination with or proximity or others without being distracted by them;
(8)     Complete a normal workday and workweek without interruptions;
(9)     Accept instructions and respond appropriately to criticism;
(10)    Get along with co-workers or peers without distracting them;
(11)    Respond appropriately to changes in the work setting;
(12)    Be aware of normal hazards and take appropriate precautions; and
(13)    Set realistic goals or make plans independently of others.

(Docket No. 11, p. 481 of 482; www.healthgrades.com/physician/dr-nestor-zambrano-xwks3).

On April 1, 2009, Plaintiff presented to Rescue Mental Health Services, a resource for

---

[6]

Bipolar II disorder is a form of mental illness.  Bipolar II is similar to bipolar I disorder, with moods cycling between high and low over time.  However, in bipolar II disorder, the "up" moods never reach full-on mania.  The less-intense elevated moods in bipolar II disorder are called hypomanic episodes, or hypomania.  A person affected by bipolar II disorder has had at least one hypomanic episode in life. Most people with bipolar II disorder also suffer from episodes of depression. This is where the term "manic depression" comes from. Www.webmd.com/bipolar-disorder/guide/bipolar-2-disorder.

emergency mental healthcare facility, for treatment (Docket No. 11, p. 401 of 482; www.rescuemhs.com).  Plaintiff was suffering from depression, social phobias and a post traumatic stress disorder (Docket No. 11, p. 400 of 482).  Individual psychotherapy sessions were conducted in May, June, July, September and October 2009 (Docket No. 11, pp. 432, 434, 435, 436, 438, 439, 440, 442 of 482).

Plaintiff participated in group therapy on November 2, 2009.  The goal/objective addressed at this session was dispensing with guilt and shame (Docket No. 11, p. 431 of 482).

## VI. MEDICAL EVIDENCE

Plaintiff's medical care was provided by health services for the Ohio Department of Rehabilitation and Corrections during 2005, 2006 and a portion of 2007.  His treatment was generally unremarkable.  On February 24, 2005, Plaintiff's glucose level was lower than normal when measured (Docket No. 11, p. 377 of 482).  He sought treatment for headaches in February 2005 and chest pain in December 2005 (Docket No. 11, pp. 354, 360 of 482).  In August 2005, the chest X-ray results were normal (Docket No. 11, p. 384 of 482).  Results from a blood sample collected on September 1, 2005 showed that some of the indicators of liver damage or injury were lower than the normal range (Docket No. 11, p. 373 of 482).  On October 4, 2005, Plaintiff was inoculated for immunity from tetanus toxoids (Docket No. 11, p. 385 of 482).

In January 2006, Plaintiff was diagnosed with hydronephrosis of the left kidney centrally.[7]  There was an inability to ascertain the level and cause of the obstruction from the studies conducted (Docket

---

[7]

Hydronephrosis is dilation of the pelvis and calyces of one or both kidneys.  This may result from obstruction to the flow of urine, vesicoureteral reflux, or it may be a primary congenital deformity without an apparent cause.  STEDMAN'S MEDICAL DICTIONARY 188840 (27th ed. 2000)

14

No. 11, p. 382 of 482).  Plaintiff was treated for sore throat, cough and stuffy nose in March 2006 (Docket No. 11, p. 349 of 482).  There is documented evidence that the medications prescribed for hypertension were self administered and that occasionally Plaintiff skipped dosages (Docket No. 11, pp. 343, 346, 351 of 482).

Plaintiff injured his right middle finger at the second joint on March 23, 2007.  The finger was not broken or fractured.  Plaintiff was given medication for pain (Docket No. 11, p. 340 of 482).

During a health screening form completed by the Ohio Department of Rehabilitation and Correction personnel and dated on May 10, 2007, it was noted that Plaintiff had been diagnosed with hypertension, migraines and pain on the right side back.  The examiner concluded that Plaintiff had obtained the appropriate medical care designed to regulate blood pressure (Docket No. 11, pp. 327-335 of 482).  In July 2007, Plaintiff was immunized against pneumonia (Docket No. 11, p. 389 of 482).

On May 9, 2008, Plaintiff presented to the Toledo Hospital with possible sexually transmitted disease exposure.  The results of the tests for chlamydia and gonorrhea were negative.  On June 5, 2008, Plaintiff presented to Toledo Hospital with complaints of dizziness.  Dr. Bobbijean E. Wood, M. D., diagnosed Plaintiff with a "stress reaction" and hypertension by history.  The laboratory work was unremarkable except that the urine drug screen was positive for cannabis (Docket No. 11, pp. 291-293, 285-290 of 482).

On January 7, 2009, Plaintiff underwent an internal medicine evaluation to address untreated hypertension, right shoulder blade pain and chest pains.  Dr. William D. Padamadan, a geriatric and internal medicine specialist, diagnosed Plaintiff with hypertension possibly renovascular in nature, kidney surgery at age 16, nonspecific chest pain, most likely noncardiac and low back pain without objective findings of functional impairment.  He noted that Plaintiff had kidney surgery at age 16 for

15

an unknown reason.  Dr. Padamadan did not see any indication for limitation of physical activities except for physiological restriction for hypertension which needed further control (Docket No. 11, pp. 318-320 of 482; http://www.healthgrades.com/physician/dr-william-padamadan-3xn3b).

Dr. Padamadan conducted manual muscle testing to determine the extent of Plaintiff's range of motion.  The results showed that Plaintiff could raise his shoulders, elbows, wrists, fingers, hips, knees, feet and great toes against maximal resistance (Docket No. 11, p. 321 of 482).  Plaintiff's range of motion in the cervical spine, shoulders, elbows, wrists, hands-fingers, dorsolumbar spine, hips and ankles was also within the numerical normal range.  The range of motion in Plaintiff's knees was twenty degrees below normal (Docket No. 11, pp.  322-324 of 482).

Having last examined Plaintiff on March 13, 2009, Dr. Zambrano memorialized Plaintiff's medical history as well as his efforts to control Plaintiff's severe, uncontrolled hypertension on a basic medical form provided by the Lucas County Department of Job and Family Services (Docket No. 11, pp. 419-427, 457-467 of 482).  Although Plaintiff needed a complete blood work up, lipid profile and thyroid function test, Dr. Zambrano concluded that Plaintiff was:  (1) extremely limited in his ability to push and pull; (2) moderately limited in his ability to bend; (3) moderately limited in his ability to engage in repetitive foot movements, (4) able to sit without interruption; (5) could stand/walk but he could not stand/walk without difficulty, and (6) could lift/carry up to five pounds frequently (Docket No. 11, pp. 392-394 of 482).

Plaintiff presented to the emergency room at Toledo Hospital with a finger injury on July 11, 2009 and for treatment of finger pain July 18, 2009.  There were no significant osseous or articular abnormalities but the finger had been dislocated.  Initially a splint was applied.  When he complained of pain, a prescription for pain medication and the number of a hand specialist was disseminated with

16

the added instruction of elevating the extremity at rest and keeping the splint on for comfort (Docket No. 11, pp. 428, 450-454 of 482).

Plaintiff suffered a right-hand injury on December 6, 2009.  The examination showed a comminuted fracture distal shaft of the fifth metacarpal (Docket No. 11, p. 475 of 482).

On January 13, 2010, Dr. S. Zakir Husain, M. D., an emergency room physician at Mercy St. Anne Hospital, diagnosed Plaintiff with right otitis media, a middle ear infection.  The infection was treated with pain medication and an antibiotic (Docket No. 11, pp. 473-474 of 482).

At Dr. Zambrano's request, Plaintiff underwent a multiplanar sonography of the kidneys to determine the etiology of flank and back pain on March 5, 2010.  The results of the renal ultrasound showed severe left hydronephrosis (Docket No. 11, p. 448 of 482).

Plaintiff underwent a computed tomography angiogram of the abdomen on March 23, 2010.  The results showed moderate to severe left hydronephrosis with evidence of prior surgery at the left ureteropelvic junction.  The radiologist attributed the findings to likely ureteropelvic obstruction (Docket No. 11, p. 469 of 482).

**VII. STANDARD OF DISABILITY**.

The ALJ considered this medical evidence and the testimony adduced by Plaintiff and the VE to decide whether Plaintiff was disabled based on the application for SSI.  SSI is only available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

17

period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively.  To assist clarity, the remainder of this Report and Recommendation references only the DIB regulations, except where otherwise necessary.

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)).  If the Commissioner makes a

18

dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. §

404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## VIII.  ALJ DETERMINATIONS

Based on the five-step sequential evaluation, the ALJ made the following findings of fact:

1.   Plaintiff had not engaged in substantial gainful activity since June 19, 2008, the
     application date.

2.   Plaintiff had severe impairments of left hydronephrosis and a learning disability.
     Plaintiff did not have an impairment or combination of impairments that met or
     medically equaled one of the listing impairments in 20 C. F. R Part 404, Subpart P,
     Appendix 1.

3.   Plaintiff had the residual functional capacity to perform medium work except that he is
     limited to performing simple, routine tasks.

4.   Plaintiff had no past relevant work.  However, considering Plaintiff's age, education,
     work experience and residual functional capacity, there were jobs in significant numbers
     in the national economy that Plaintiff could perform.

5.   Plaintiff was not under a disability as defined in the Act since June 19, 2008.

(Docket No. 11, pp. 59-66 of 482).

This ALJ's decision became the final decision of the Commissioner.  The Appeals Council

denied Plaintiff's request for review of the Commissioner's final decision.  Therefore the final decision

of the Commissioner was binding until Plaintiff filed a Complaint in federal district court seeking

judicial review.

## IX.  JUDICIAL REVIEW STANDARD.

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d

830, 832 -833 (6th Cir. 2006).  The district court must affirm the Commissioner's conclusions unless the

Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported

by substantial evidence.  *Id*. at 833 (*citing Branham v. Gardner,* 383 F.2d 614, 626-627 (6th Cir. 1967)). In fact the Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence.  *Id.* (*citing* 42 U.S.C. § 405(g )).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (*citing Besaw v. Secretary of Health and Human Services,* 966 F.2d 1028, 1030 (6th Cir. 1992)).

"The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Id.* (*citing Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).  Therefore the reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994) (*citing Brainard v. Secretary of Health and Human Services*, 889 F. 2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F. 2d 383, 387 (6th Cir. 1984)).

## X. PLAINTIFF'S CLAIMS.

1.    Defendant committed a fatal error in finding that Plaintiff had a marginal education rather than being illiterate under Sixth Circuit case law, rendering the hypothetical to the VE as inaccurate and the VE testimony resulting therefrom not based on substantial evidence.

2.    Defendant failed to include Plaintiff's severe intellectual impairment and properly distinguish between borderline intellectual functioning and mild mental retardation, rendering Defendant's decision not based on substantial evidence.

3.    Defendant failed to properly consider the severe combination of all Plaintiff's impairments, severe and non-severe, rendering findings number two and three inaccurate and failing to comply with proper procedure for determining weight to accord treating source opinion, all rendering a decision not based on substantial evidence.

4.    Defendant gave improper hypotheticals to VE and answers relied upon by Defendant are not supported by substantial evidence.

## XI. Defendant's Responses.

1.  Plaintiff's school records show normal cognitive function, a learning disability, poor academic performance and maladaptive behaviors.  Plaintiff never even claimed to be illiterate, he was literate and in any event, the ALJ properly discounted his educational attainment to account for his learning disability in reading.

2.  Plaintiff's cognitive and psychological records compiled during the period of alleged disability show little treatment, few psychological symptoms and malingering to obtain SSI.

3.  Substantial evidence supports the ALJ's finding that Plaintiff was not disabled by his alleged physical impairments and/or mental impairments.

4.  The ALJ was not bound to accept the conclusory statements from Dr. Zambrano that Plaintiff was totally disabled from hypertension.

## XII. Analysis

### 1.  Determination of Literacy.

Based on Plaintiff's testimony and the measurements of intellect, the ALJ found that Plaintiff had a learning disability.  He categorized Plaintiff's educational attainment as marginal as defined under the Act.  Plaintiff contends that the hypothetical questions posed to the VE and the conclusion derived therefrom are patently inaccurate as the evidence in the record shows that he is illiterate.  According to Plaintiff, this case is ripe for remand so that the Commissioner can consider the impact of illiteracy on his functional capabilities and vocational factors.

In addition to the claimant's age, impairments and past work experience, the determination of whether a claimant has formal schooling or other training which contributes to the ability to meet vocational requisites can be a deciding factor in determining whether a plaintiff is disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2 (Thomson Reuters 2012).  In the absence of evidence to the contrary, an individual's numerical level will generally determine educational ability.  20 C. F. R. § 416.964(b) (Thomson Reuters 2012).

Under the Act, education classifications fall into four areas:

(1) **Illiteracy**, defined as the inability to read or write, with little or no formal schooling. SSA will consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. 20 C. F. R. § 416.964(b)(1) (Thomson Reuters 2012).

(2) **Marginal education** means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. SSA generally considers that formal schooling at a sixth grade level or less is a marginal education. 20 C. F. R. § 416.964 (b)(2) (Thomson Reuters 2012).

(3) **Limited education** means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semiskilled or skilled jobs. SSA generally considers that a seventh grade through the eleventh grade level of formal education is a limited education. 20 C. F. R. § 416.964(b) (3) (Thomson Reuters 2012).

(4) **High school education and above** means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a twelfth grade level or above. SSA generally considers that someone with these educational abilities can do semiskilled through skilled work. 20 C. F. R. § 404.1564 (b)(4) (Thomson Reuters 2012).

In the Sixth Circuit, an individual with educational attainment of less than the third grade level was considered functionally illiterate. *Robinson v. Commissioner of Social Security*, 2011 WL 400223, *9 (N. D. Ohio 2011) (*citing Skinner v. Secretary of Health and Human Services*, 902 F. 2d 447, 450-451 (6th Cir. 1990)).

Here, the ALJ did not rely on Plaintiff's numerical grade level in determining his educational ability. Instead, the ALJ is ambiguous on the issue of whether Plaintiff can read or write by finding that Plaintiff had a learning disability and therefore a marginal education. The Magistrate is not persuaded that substantial evidence supports the ALJ's findings. Plaintiff did not obtain a driver's license because he could not read. He did not cook because he could not read. Plaintiff never scored higher than a third grade reading and math levels on the MAT or WRAT examinations. Results from the WRAT examination placed Plaintiff's ability to read and comprehend what he read in the illiterate category.

22

Similarly Plaintiff's scaled scores showed that he failed the reading, writing and math portions of the Ohio Ninth Grade Proficiency Test.  Except for Dr. Layne's assertion that Plaintiff filed out "our form accurately", there is little evidence that Plaintiff can read with comprehension or that he has a reasoning ability in arithmetic to the extent that he can meet the reading, writing, language and math skills which are needed to do simple, unskilled types of jobs.

Since there is a conflict between the ALJ's findings and the regulations, on remand the ALJ shall determine and make a finding as to Plaintiff's level of literacy.  The ALJ shall then determine whether Plaintiff's level of literacy is consistent with the jobs specified by the VE, obtain a reasonable explanation for any variation or provide a hypothetical that accurately describes Plaintiff's educational classification and the jobs, if any, that Plaintiff can perform given his level of literacy.

## 2.    PLAINTIFF'S INTELLECTUAL IMPAIRMENTS.

Plaintiff suggests that the ALJ erred in failing to include in the hypothetical questions posed to the VE that he was mildly or moderately mentally retarded and that given his IQ scores, his mental impairments meet 12.05C and 12.05 of the Listing.

In assessing mental deficiency, Section 12.05 of the Listing at 20 C. F. R. Pt. 404, Subpt. P, App. 1, provides guidance as to whether a claimant meets the mental retardation standard.  However, before analyzing the terms of Section 12.05, the evaluator must consider whether the claimant has significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports the onset of the impairment before age 22.  "Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting."  *Justice v. Astrue,* 2011 WL

23

6338804, *9 fn. 3 (N. D. Ohio 2011) (*citing* DSM-IV, *supra*, p. 42).

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> A.  Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; or
>
> B.  A valid verbal, performance, or full scale IQ of 59 or less; or
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or
>
> D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
> > 1.  Marked restriction of activities of daily living; or
> >
> > 2.  Marked difficulties in maintaining social functioning; or
> >
> > 3.  Marked difficulties in maintaining concentration, persistence, or pace; or
> >
> > 4.  Repeated episodes of decompensation, each of extended duration.

`

20 C.F.R. Pt. 404, Subpt. P, App. 1 (Thomson Reuters 2012).

**A.    12.05A OF THE LISTING.**

The record contains direct evidence that Plaintiff's full scale IQ fell within the mildly mentally retarded range of adult intellectual functioning prior to age 22.  In this regard, Dr. House determined that Plaintiff had difficulty with verbal concept formation, verbal social judgment and common sense.  However, Dr. House noted that Plaintiff's effort was affected to some degree by his physical health due to what he described as a headache so Plaintiff's actual IQ was likely around 75.

It is true that there are conflicts between the scores on Plaintiff's IQ.  Plaintiff obtained a full scale IQ score of 90 in 1994, later in 2002, Plaintiff obtained a full scale IQ score of 67 which indicates that he was in the mentally retarded range.  To the extent that Plaintiff contends that the ALJ erred by

24

failing to consider that Dr. House's conclusion is the equivalent to 12.05 of the Listing, the ALJ acknowledged and discussed whether Plaintiff was mentally retarded.  However, the ALJ's analysis is incomplete.  Before the examiner can assess the presence of mental retardation as defined under 12.05A, consideration must be given to whether there were deficits in adaptive functioning due to Plaintiff's intellectual functioning.  The school records, all of which provide insight on how Plaintiff effectively or perhaps ineffectively coped with common life demands such as functional academic skills, socialization and standards of personal independence, were summarily dismissed from the ALJ's consideration.  Specifically, the ALJ failed to consider the evidence that will answer the question of whether Plaintiff had significantly subaverage general intellectual functioning with deficits in adaptive functioning that became apparent before age 22.

On remand, the Commissioner is directed to consider whether Plaintiff has presented sufficient evidence that his impairment meets or equals 12.05A of the listing.  This entails consideration of all evidence that supports a finding of mental retardation, including evidence that demonstrate whether Plaintiff had deficits in adaptive functioning that were manifested prior to age 22 and whether his mental incapacity was evidenced by dependence upon others for personal needs and an inability to follow directions.

### B.    12.05 OF THE LISTING.

At the heart of the ALJ's finding is a decision that Plaintiff's IQ scores are invalid.

Courts can reject lower scores if the examiner finds that the claimant's score did not reflect his or her real status because the claimant did not put forth good effort on the tests.  *Booth v. Commissioner of Social Security*, 2009 WL 580312, *4 (N. D. Ohio 2009) (*citing Williamson v. Secretary of Health*

*and Human Services*, 796 F. 2d 146, 150 (6th Cir. 1986)).  Dr. House opined that the diagnostic test results were an approximation of Plaintiff's intellectual functioning since he had a headache when the test was administered.  Similarly, Dr. Layne discounted the diagnostic test because of the gamesmanship Plaintiff employed when the test was being administered.  Considering these factors, the ALJ explained why he found Dr. Layne's assessment of Plaintiff's scores the result of manipulation or motivation to fail, credible.

There is substantial evidence to support the ALJ's decision to reject the IQ scores adduced by the tests administered by Drs. House and Layne.  Having decided that the IQ scores are not valid, the Magistrate is persuaded that no further evaluation is required to assess whether Plaintiff's impairments meet or equal 12.05B, 12.05C or 12.05D of the Listing.

## C.    BORDERLINE INTELLECTUAL FUNCTIONING.

Plaintiff contends that the ALJ erred in failing to evaluate whether his IQ scores placed him within the borderline intellectual functioning category and then considering whether the borderline intellect along with complaints of anxiety, depression and a bipolar disorder fashion a severe impairment.

The American Association on Mental Deficiency lists five psychologic classifications for sub-average general intellectual functioning.  STEDMAN'S MEDICAL DICTIONARY 353650 (27th ed. 2000).  An IQ. of 70 to 85 signifies "borderline intellectual functioning."  STEDMAN'S MEDICAL DICTIONARY 353650 (27th ed. 2000).

Consulting examiner, Dr. Bergsten, diagnosed Plaintiff with borderline intellectual functioning based solely on her review of the record.  The diagnostic corroboration of Plaintiff's IQ showed something to the contrary.  At age 11, Plaintiff had a full scale IQ of 90.  Other diagnostic corroboration

26

of Plaintiff's IQ administered when he 19 and again when he was 25 years of age, showed a full scale IQ of 67 and 48, respectively.  Without commenting on the ALJ's assessment regarding the validity of the IQ scores, none of these scores place Plaintiff within the borderline range of intelligence.  The Magistrate is persuaded that Plaintiff cannot meet the diagnostic threshold IQ; therefore, the ALJ did not err in failing to treat borderline intellectual functioning as an additional limitation.

3.     THE COMBINATION OF IMPAIRMENTS.

Plaintiff claims that the ALJ failed to consider that he had uncontrolled hypertension for which he was prescribed several medications he could not afford.

The Magistrate finds that the ALJ considered Plaintiff's uncontrolled hypertension at step two of the five-step sequential evaluation.  The ALJ specifically observed that the medical records established that Plaintiff had hypertension but that Plaintiff was not compliant with the medication regimen.  Although he claimed that he could not afford his medicine, the ALJ noted that this claim was at odds with Plaintiff's choices.  Plaintiff continued to abuse tobacco.  At the hearing, Plaintiff testified that he was treating with Dr. Zambrano monthly.  The ALJ had legitimate reasons for discounting Plaintiff's challenge to his inability to afford his medication.  The ALJ considered that Plaintiff's uncontrolled hypertension was subject to his control.

4.     THE TREATING PHYSICIAN.

Plaintiff contends that the ALJ failed to attribute controlling weight to Dr. Zambrano's opinions expressed in the Basic Medical Form completed for the Lucas County Department of Job and Family Services.  Alternately, the ALJ failed to explain why such opinion was not given deference.

It is well established that the treating source rule is one that the ALJ must follow when assessing

27

the medical evidence provided in support of a claim for disability benefits. *Sims v. Astrue*, 2011 WL 1256655, *4 (N. D. Ohio 2011). This rule requires the ALJ to give a treating source opinion "controlling weight" if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)). A physician qualifies as a treating source if the claimant sees her "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." *Id.* (*citing* 20 C.F.R. § 404.1502). The ALJ need not credit a treating source opinion that is conclusory and unsupported. *Id.*

Of course the ALJ may grant a treating physician's medical opinion less than controlling weight provided the ALJ's decision is accompanied by "good reasons" that are both: (1) supported by the evidence in the case record, and (2) sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *Id.* (*citing* SSR. 96–2p, TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE, 1996 WL 374188 (1996)). The ALJ's failure to follow the procedural requirement "of identifying the reasons for discounting the opinion and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (*citing Rogers v. Commissioner of Social Security*, 486 F.3d 234, 243 (6th Cir. 2007)). In the event that the ALJ does not give controlling weight to a treating physician's opinion, he must still consider how much, if any, weight to give that opinion by considering the following factors:

    (1) the frequency of examination and the length, nature, and extent of the treatment relationship;
    (2) the evidence in support of the treating physician's opinion;
    (3) the consistency of the opinion with the record as a whole;

(4) whether the opinion is from a specialist; and

(5) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Id.* at *4-5.

In this case, the ALJ failed to make sufficiently clear why he rejected the treating physician's opinion even though substantial evidence not mentioned may exist to support the ultimate decision. The ALJ claimed that Dr. Zambrano completed the basic medical form only two weeks after he first saw him. This is not a clearly articulated reason for the findings and conclusions the ALJ made. Simply, the Magistrate cannot conduct meaningful judicial review as there is no clear picture of whether Dr. Zambrano's opinions were considered or completely ignored.

Given such error, the Magistrate finds that the ALJ erred in evaluating Dr. Zambrano's opinions. This matter is remanded to the Commissioner for further proceedings so that the ALJ can properly evaluate the medical evidence in accordance with agency regulations and controlling law.

## 5.    THE USE OF OCCUBROWSE AS AN OCCUPATIONAL SOURCE.

At the hearing, the VE informed counsel that he used a computer software program known as OccuBrowse in addition to DOT. Plaintiff claims that OccuBrowse is not a recognized program or source for comparing limitations and restrictions with available jobs and the VE failed to provide counsel with the information used from OccuBrowse.

The regulations do not require that the Commissioner or the VE rely on classifications in a particular source such as DOT. *Ewing v. Commissioner of Social Security*, 2010 WL 6090420, *7 (W. E. Mich. 2010). The pertinent regulation, 20 C. F. R. § 416.966(d), (e), provides that an agency may take administrative notice of reliable job information available from various government and other

publications including DOT.  However, occupational evidence provided by the VE generally should be consistent with the occupational information supplied by the DOT.  POLICY INTERPRETATION RULING: TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISION, 2000 WL 1898704, *1, SSR 00-4p (2000).

In the instant case, the VE used DOT to match Plaintiff's physical and mental limitations with an occupational base.  The VE testified that the occupational evidence provided was consistent with the occupational information supplied by the DOT.  The proposed jobs within the occupational base were then filtered through OccuBrowse, a software program provided by a private vendor, to determine the availability of proposed jobs in the local and national economies.  According to the VE, OccuBrowse siphons data from the Bureau of Labor Statistics, a division of the United States Department of Labor, to determine the numbers of jobs available.  The VE did not use OccuBrowse to supplant the DOT but it was used to supplement the DOT with the availability of jobs that Plaintiff could perform.  Since the occupational evidence provided by the VE was consistent with the occupational information supplied by the DOT, the VE's use of OccuBrowse did not conflict with the regulations.

6.      **FAILURE TO DEFINE SIMPLE OR ROUTINE TASKS.**

Plaintiff suggests that the ALJ did not define "simple, routine tasks" within the context of medium work.  Consequently, limiting Plaintiff to simple, routine tasks is meaningless.

Medium work requires the ability to lift and carry no more than 25 pounds frequently or 50 pounds occasionally and to stand or walk, intermittently, for a total of approximately six hours in an 8-hour workday.  20 C.F.R. § 416.967 (Thomson Reuters 2012).  A person who is capable of performing jobs in the more strenuous levels is assumed to be able to perform jobs in the categories which require

less exertion as well.  20 C. F. R. § 416.967 (Thomson Reuters 2012).

The ALJ's determination that Plaintiff was confined to simple, routine work is within the category of medium work as a limitation to unskilled work.  In other words, Plaintiff was confined to work that required little or no judgment to do and to perform simple duties that could be learned in a short period of time.  The Magistrate is persuaded that no further inquiry is required of the ALJ or VE as to the meaning of these terms.

**7.**     **REMAND FOR CONSIDERATION OF NEW EVIDENCE.**

On June 25, 2010, the ALJ rendered a decision that denied Plaintiff's application for SSI. During November 2010, Plaintiff underwent a left nephrectomy.  In June 2011, the appeals council denied Plaintiff's request for review and forwarded his new application to the local Social Security office (Docket No. 11, p. 6 of 482).  Plaintiff seeks a sentence six remand to the Commissioner for consideration of the kidney disease, surgery and the complications of hypertension on kidney disease.

The Sixth Circuit has interpreted 42 U. S. C. § 405(g) as creating three requirements to warrant remand for consideration of additional evidence.  *Jacob v. Astrue*, 2011 WL 723059, *4 (N. D. Ohio 2011) (*citing Sizemore v. Secretary of Health & Human Services*, 865 F.2d 709, 711-713 (6ᵗʰ Cir. 1988); *Cotton v. Sullivan*, 2 F.3d 692, 695 (6ᵗʰ Cir. 1993)).  First, the claimant must submit evidence that is new. *Id.*  "New evidence must indeed be new; it cannot be cumulative of evidence already in the record." *Id.* (*citing Elliot v. Apfel*, 28 F. App'x 420, 423 (6ᵗʰ Cir. 2002)).  Second, the evidence must be material. *Id.* To satisfy this burden, the claimant must "demonstrate that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence."  *Id.* (*citing Sizemore*, 865 F.2d at 711).  Third, the claimant must show good cause exists for her failure to include the evidence in a prior proceeding.  *Id.* (*citing Delgado v. Commissioner of Social Security*, 30 F. App'x 542,

31

549 (6th Cir. 2002)).

In applying these standards to this case, it is clear that the records memorializing the surgery and subsequent treatment are new in the sense that the reports were generated after the hearing.  Plaintiff had reasonable justification for not presenting the evidence to the ALJ as it was not accrued until after the ALJ delivered the decision denying benefits.  Plaintiff can satisfy the first and third elements of this three-part test.

Plaintiff's claim fails, however, when he attempts to comply with the second element of the three- part test.  Plaintiff points out that Dr. Padamaden linked his hypertension to renovascular disease (Docket No. 11, p. 320 of 482).  Plaintiff argues that the removal of the kidney lends credibility to the claims of uncontrolled hypertension and the fact that medications were insufficient to control his hypertension due to underling kidney disease.  Thus the surgery records are material to the determination that Plaintiff's uncontrolled hypertension was severe.

The Magistrate finds this allegation of little avail since Dr. Padamaden only suspected that there was a link between hypertension and renovascular disease.  He never completed the requisite diagnostic or clinical tests from which to make the definitive correlation.  Nevertheless, if the surgical evidence shows that the hypertension issues were resolved as a result of the surgery, such evidence will unlikely relate to the time period for which disability benefits were denied.  If the removal of the kidney relates to the deterioration of the hypertension, it is not material as it relates to a period of time after the period for which benefits were sought.  In any event, Plaintiff has not shown that the outcome will be different if the case is remanded for consideration of the surgery evidence.

For these reasons, the Magistrate recommends that Plaintiff's request for a sentence six remand be denied.

32

## XI.  CONCLUSION

For the foregoing reasons, the Magistrate recommends that the Court reverse the decision of the Commissioner, remand the case to the Commissioner pursuant to sentence four of 42 U. S. C. § 405(g) with the following instructions, terminate the referral to the undersigned Magistrate and close the case.

On remand, the ALJ is instructed to:

(1)    determine and make a finding as to Plaintiff's educational background (illiteracy or mental retardation or borderline intellectual functional capacity) even if supplemental or clarifying evidence must be obtained;

(2)    determine and make a finding whether given Plaintiff's educational background, 12.05A of the Listing is met.

(3)    determine and make a finding as to whether Plaintiff's educational background is consistent with the jobs specified by the VE or obtain a reasonable explanation for any variation;

(4)    properly assess and evaluate Plaintiff's impairments, including his educational background, in accordance with agency regulations and controlling law; and

(5)    determine if alternate jobs are available to Plaintiff in the economy considering age, education, work experience and residual functional capacity.


                                    /s/Vernelis K. Armstrong
                                    United States Magistrate Judge


Dated:        May 4, 2012



## XII. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, as amended on December 1, 2009, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the

fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.